538

## Silver et ux. v. Board of Appeals, etc.

*William J. Madden, Jr.*, for applicant.

*Solomon Hurwitz* of *Hurwitz, Klein, Meyers & Benjamin*, for appellants.

*Spencer G. Hall*, city solicitor, for City of Harrisburg.

SMITH, P. J., March 15, 1954.—This is an appeal by Morris A. Silver and Mollie C. Silver, his wife, on their own behalf, and for all other protestants, from a decision and order of the board of appeals duly constituted and acting under the provisions of the "Harrisburg Zoning Ordinance of 1950" (hereinafter sometimes called the zoning ordinance) effective October 3, 1950. Therein, the board of appeals, after hearing, reversed the action of the zoning administrator and directed the issuance of a certain zone permit as an accessory use to an apartment building hereinafter described. The appeal was heard and argued before the court en banc on the record as made before the board of appeals.[1]

---

[1] The Harrisburg Zoning Ordinance of 1950—the city was not zoned prior thereto—was passed under the zoning provisions of the Third Class City Law of June 23, 1931, P. L. 932, subsequently revised and amended by the Act of June 28, 1951, P. L. 662, wherein, inter alia, the board of appeals, provided for in the 1931 Act and established by the zoning ordinance, is now called the board of

River House Apartments, Inc., under a building permit duly obtained prior to the enactment of the zoning ordinance, erected on the east side of Front Street between Emerald and Seneca Streets in the City of Harrisburg on a plot of ground having a frontage of approximately 265 feet and a depth of approximately 200 feet, a 13-story apartment building known as River House Apartments and numbered 2311 North Front Street. This apartment building as constructed has 275 rental units and also a private garage in the basement thereof providing space for the storage of 106 automobiles, solely for the use of the tenants thereof. Surface parking for 25 additional automobiles is also provided on the premises. A driveway leads eastwardly along the south side of the River House Apartments from Front Street to the rear thereof, thence northwardly along the same and thence westwardly along the north side of the building to Front Street. Both the entrance to and the exit from the basement garage—separated by a small triangular curbed plot—are on the south side of the apartment building seven feet below the level of Front Street, and approximately 87 feet from the east curb thereof. Automobiles to enter the basement garage are required to use the aforesaid driveway leading from Front Street along the south side of the apartment building. In leaving the garage, they are required to traverse the balance of the driveway heretofore described which brings them out to Front Street on the north side of the building.

The apartment building under the zoning ordinance is located in a "Business Front" or "BF" zone. This zone extends, so far as here material, along the east

adjustment. In the disposition of the appeal, this court may reverse or affirm, in whole or in part, or may modify the decision appealed from, as to it may appear just and proper. See section 4129 of the Act of June 28, 1951, P. L. 662, supra, 53 PS §§12198-4129.

side of North Front Street from Reily Street to Wiconisco Street. As plotted, North Front Street in this area extends to low water mark of the Susquehanna River. On the west or river side of the paved cartway thereof, there is a public park whereon no buildings or other structures are or may be erected. In a "BF" zone the following buildings, structures and uses are permitted: All buildings, structures and uses permitted in an R-1 Zone;[2] detached multiple dwellings;[3] detached buildings for any of the non-dwelling uses permitted in an R-3 Zone;[4] two- or three-family detached dwellings treated as a unified whole or as manor-group dwellings, and funeral homes. The zoning ordinance also provides that "in all zones accessory uses and buildings shall be permitted in conjunction with the buildings, structures and uses specifically permitted for each zone", and defines "accessory use" as a "use, not otherwise contrary to law,

---

[2] The buildings, structures and uses permitted in an R-1 Zone are: Single-family detached dwellings, with floor space of 400 square feet or more; churches and religious buildings, public, private or parochial schools offering courses in general education, accredited colleges, libraries, community assembly halls, governmental buildings. Also public utility buildings or structures if the board of appeals, as hereinafter created, upon appeal, finds that their location is necessary to the service of the district and approved the location and design; publicly owned or publicly operated parks, play spaces and other recreational facilities with customary incidental buildings, structures and uses.

[3] Detached multiple dwellings are defined in the zoning ordinance as "A single building containing dwelling space for four or more family units not including row houses, groups of attached dwellings, nor manor-group dwellings, and not including hotels, lodging or boarding houses, hospitals or other similar institutions".

[4] Detached buildings for nondwelling uses permitted in an R-3 Zone are those used for a studio, office or laboratory for doctors, dentists, or other registered professions, or for central offices and headquarters of a regional nature for public, quasi-public, civic, fraternal, financial or business agencies, involving no manufacture, buying or selling of goods or manual services other than supplies incidental to such permitted principal uses and involving no street or window display.

customarily incidental to the principal use of a building. . ." .

The following improvements and uses all located on the east side of North Front Street from Emerald Street to Seneca Street are first, the single 12-room stone dwelling house and detached garage of appellants, Doctor and Mrs. Silver, known as 2301 North Front Street, erected on a lot approximately 100 by 176 feet; then the River House Apartments heretofore described; then a restricted parking lot of the Ohev Sholom Temple, and then the temple itself, which is located at the southeast corner of North Front and Seneca Streets. To the rear of the apartment building are private dwellings fronting on the west side of North Second Street.

The basement garage facilities, solely for the use of the tenants of the apartment building, were leased by River House Apartments, Inc., to one William Balderston, also known as James W. Balderston, Jr. As such lessee and with the approval of the lessor, Mr. Balderston, on September 10, 1952, filed an application with the zoning administrator requesting a zone permit for a "private gasoline filling station for use of residents on the site only, fixing flats and car washing only". Prior to the filing of this application, a building permit had been secured from the building inspector of the city for the installation of the pump and tank. As proposed to be installed, the pump and tank will be located within and on the aforesaid triangular curbed plot which separates the entrance to and the exit from the basement garage. The pump will be approximately 30 feet north of the northern line of appellants' residence. It will extend 3½ feet above the ground, will be orange in color, contain no signs and only a light inside the same for the purpose of illuminating the dial thereof. The gasoline tank will be entirely under ground.

The zone permit as applied for was refused by the zoning administrator who held that a filling station is not permitted in a BF zone and, further, that, under the provisions of the zoning ordinance, a private filling station is not customarily incidental as an accessory use to a multiple dwelling or apartment house as defined therein, whether containing four or several hundred family units. From this refusal, Mr. Balderston duly filed his appeal with the board. At the hearing thereon, he was represented by Alton W. Lick, Esq., who is the principal shareholder and president of River House Apartments, Inc.

Appellants and five owners of dwellings located on the east and west side of North Second Street in the 2300 block appeared before the board in opposition to the zone permit. The substance of their testimony was that the installation of the proposed pump and tank would depreciate the value of their properties, create a fire hazard and disturb the peace and quiet of the neighborhood in which they live. Nevertheless, the board, after full consideration of all the testimony submitted to it, reversed the zoning administrator and granted the zone permit here appealed from as an accessory use to the River House Apartments. [5]

It is well settled that the courts will not interfere with the exercise of an administrative duty by the officials intrusted therewith unless it is shown that the action taken has been arbitrary, capricious and unreasonable or clearly in violation of positive law: Floersheim Appeal, 348 Pa. 98 (1943). In our opinion, the proposed uses under the permit as granted by the board of appeals are not clearly in violation of the zoning ordinance and can be conducted without affecting or disturbing the peace, comfort, safety or welfare

---

[5] At the hearing of the appeal in this court, the assistant city solicitor also appeared in support of the board's action.

of appellants and the other protestants who now live on thoroughfares heavily traveled at all hours of the day and night by automobiles, buses and trucks with the noises and gasoline fumes incidental thereto. And if, in this case, the operation of the private filling station should constitute a nuisance, appellants have their remedy in equity. Such relief is beyond the jurisdiction of the zoning board to consider and likewise beyond the jurisdiction of this court to determine in the instant appeal: Schleifer v. Zoning Board of Adjustment, 374 Pa. 277 (1953); Alden Park Corporation et al. v. Philadelphia Zoning Board of Adjustment, 84 D. & C. 40 (1952).

The application for the zone permit in question was not predicated upon an allowance of an exception or a variance. It was predicated solely on the ground of an accessory use. Here we have an apartment building with 275 rental units and a basement garage providing space for the storage of 106 automobiles solely for the use of the tenants thereof. At the time of the hearing before the zoning board, 262 of the rental units were occupied and 68 of the tenants used the garage facilities.

The zoning ordinance defines "accessory use" as a "use, not otherwise contrary to law, customarily incidental to the principal use of a building . . .". The city zoning administrator, when testifying before the zoning board in the instant case in support of his refusal to issue the zone permit as an accessory use, said:

"The refusal of the permit is not to be taken as a disapproval of the project for serving these people in the apartment. I think an apartment house of this size, under proper conditions, such a facility should be provided, and that the city should grant a permit for it. However, as zoning administrator, I am limited to the bare text of the ordinance; and I cannot, as zoning

administrator, administer an apartment of this size any different from any other apartment."

We cannot agree with such a narrow interpretation of the zoning ordinance. Manifestly, what is customarily incidental to the principal use of a multiple dwelling containing four rental units is not here controlling. The narrow question presented to us is what is customarily incidental to the principal use of a multiple dwelling of the size of the River House Apartments supplying automobile storage facilities for its tenants. On this question, W. W. Dodson, president of the Merchants and Business Men's Mutual Fire Insurance Co., testifying before the zoning board as a witness for appellants, said that the gasoline pump "would be quite a convenience to tenants" and, further:

"I know we have considered a great many apartment houses similar to the Riverside House . . . and that most of them come in on a grade at the rear, and they have a garage in basement, and fireproof construction, and they have a gas pump inside the door."

In Borden Appeal, 369 Pa. 517 (1952), the Supreme Court held that where a zoning board within the exercise of its discretion authorizes the erection of an apartment building as a special exception, anything which logically accompanies the normal operation thereof, such as a parking lot or a restaurant for the exclusive use of the apartment house tenants—*obviously accessory uses*—must also be authorized. In so holding, Mr. Justice Musmanno, speaking for the court, said, pp. 520-522:

"Law, in order to produce justice, must apply to objective realities of today and not to abstract visions of the past. The apartment house of today bears little in common with the private home of yesterday, which every home owner regarded as his castle. With the progress made in scientific living quarters the modern apartment is more apt to provide what was regarded

as the fabulous comfort of a castle than the ancient, slate-roofed, rain-spouted frame houses so cherished in sentiment and often lacking in physical conveniences.

"The constant augmenting of our population, the insatiable demands being made for the housing of motor vehicles multiplying with rabbit-like fertility in every community, and the increasing migration of people from countryside to urban or near-urban sites are making multiple dwellings more and more a necessity rather than a luxury. . . .

"Appellants complain about the open-air parking lots and the dining room in the apartment buildings authorized to the intervenors, arguing that the Board of Adjustment would not have had the right to grant a special exception for a parking lot or a restaurant if the application were made for either of these commercial uses alone. But the hypothesis is irrelevant. Conceding that the intervenors could not, under the ordinance, conduct a general public parking enterprise, or an open-to-the-public restaurant, it does not follow that they should be denied the operation of such facilities for the exclusive use of the apartment house tenants.

"Once it is decided that the apartment building comes within the special exception provided in the ordinance, and once it is established that the board did not abuse its discretion in reaching this conclusion, and we do so find, anything which logically accompanies the normal operation of an apartment building must also be authorized. And we cannot conceive of facilities more indispensable to an apartment dweller than quarters for his automobile which he needs in traveling to and from the apartment, and a dining room in which to eat."

For other cases on accessory uses see Lord Appeal, 368 Pa. 121 (1951) ; also Canning v. Board of Adjustment of Haverford Township, 37 Del. Co. 323 (1950).

Upon application of the principles of the Borden case, we cannot adopt appellants' contention that the basement garage here in question is now being operated as a lawful nonconforming use. On the contrary, we think that such use under the zoning ordinance is conforming.

From the record before us, we can find nothing to justify us in holding that the action taken by the zoning board when reversing the zoning administrator and granting the zone permit in the present case as an accessory use was arbitrary, capricious and unreasonable or clearly in violation of the zoning ordinance.

Accordingly, we enter the following

*Order*

And now, March 15, 1954, the appeal of Morris A. Silver and Mollie C. Silver, his wife, on their own behalf and for all other protestants, is hereby dismissed at the cost of appellants.